Opinion issued May 8, 2008










 







In The

Court of Appeals

For The

First District of Texas






NO. 01-04-00627-CV






BLITZ HOLDINGS CORPORATION AND GCM CORPORATION, LTD.,
Appellants


V.


GRANT THORNTON, LLP AND DELOITTE & TOUCHE, LLP, Appellees






On Appeal from the 280th District Court

Harris County, Texas

Trial Court Cause No. 2001-38158









MEMORANDUM OPINION ON REHEARING 

 We issued an opinion in this case on May 24, 2007. Appellants, GCM
Corporation, Ltd. (GCM) Blitz Holdings Corporation, moved for a rehearing. After
receiving a response from appellees, Grant Thornton, LLP (Grant) and Deloitte &
Touche, LLP (Deloitte), we granted rehearing, withdrew our opinion, vacated our
judgment of May 24, 2007, and issued a new opinion on October 25, 2007. GCM and
Blitz filed a second motion for rehearing and also filed a motion to recuse Justice
Alcala, the author of the May 24, 2007 and October 25, 2007 opinions. Justice Alcala
recused herself from this case. The remaining panel members grant rehearing, (1)
withdraw the opinion of October 25, 2007, authored by Justice Alcala, vacate our
judgment of October 25, 2007, and issue this opinion. 

 Appellants, GCM and Blitz, (2) appeal from a take-nothing judgment rendered in
favor of Grant and Deloitte. This case concerns audit reports prepared by Grant and
business valuations prepared by Deloitte, of corporations, IFS Financial Holdings
Corporation (IFS) and Interamericas Financial Holdings Corporation (Interamericas),
that were indebted to GCM. GCM contends that by relying on the erroneous
information in these reports about the financial condition of IFS and Interamericas,
GCM did not foreclose on the debt and instead restructured the debt, which caused
GCM to ultimately lose $74 million when the debt was not paid after the restructure. 
The trial court granted a partial summary judgment in favor of Deloitte, and, at trial,
directed verdicts in favor of Grant and Deloitte.

 In its third issue, GCM challenges the trial court's directed verdict in favor of
Grant and Deloitte on all of GCM's claims, asserting that GCM produced more than
a scintilla of evidence to prove the damages that it would have recovered had it
foreclosed on the debt in either October 1999 or March 2000 instead of restructuring
the debt. In its eleventh issue, GCM asserts that the trial court erred by rendering
partial summary judgment in favor of Deloitte by determining that the 2000 IFS Note
was not a security as a matter of law under the Texas Securities Act. See Tex. Rev.
Civ. Stat. Ann. arts. 581-1 to 581-43 (Vernon 1964 & Supp. 2007). We affirm the
judgment of the trial court.

Factual Background

 GCM was a company in the business of assisting Mexican nationals to make
investments in the United States. GCM took the funds that it received from these
investors and loaned the money, an amount that totaled approximately $95 million in
December 1998, to IFS and IFS's parent company, Interamericas. Of this total
amount, IFS owed GCM $18.2 million pursuant to the terms of a "Basic Agreement,"
which was ultimately paid in full. The remaining loan by GCM was with
Interamericas for a total of $76 million for five promissory notes pursuant to a "Credit
Agreement."

 Interamericas secured its indebtedness by an "Agreement Concerning
Collateral" that provided that Interamericas pledged shares of stock in IFS, IFS
pledged shares of stock in one of its subsidiaries, and Hugo Pimienta pledged 64%
of the outstanding voting shares in IFS. Pimienta was the principal owner and
investor of IFS, Interamericas, and related companies. The agreements specifically
required the value of the collateral to meet what the parties refer to as the "market
value ratio" and the "book value ratio." (3) Further, the agreements required that the
market value of the shares be determined by Marshall & Stevens, Incorporated or "by
an appraisal firm selected by [GCM] and acceptable to [Interamericas]." The book
value of the stock was to be determined "on the basis of IFS's audited financial
statements prepared in accordance with [Generally Accepted Accounting Principles]
as of the end of the immediately preceding fiscal year." The first payments for these
debts were due October 31, 1999. Before the first payments were due, however, IFS
and Interamericas filed suit and obtained a temporary restraining order preventing
GCM from accelerating the debt or foreclosing on the collateral. 

October 1999 Restructure that Relied on Grant's Audits for 1998

 After the lawsuit was filed in 1999, GCM entered into settlement negotiations
with IFS and Interamericas, which resulted in the October 1999 debt restructure. 
Under the debt restructure in October 1999, Interamericas and IFS agreed to pay
GCM $2 million upon execution of the agreement, $18 million by December 3, 1999,
and $12 million by January 31, 2000. Interamericas and IFS paid the first two
payments that totaled $20 million, but missed the third payment of $12 million that
was due January 31, 2000.

 In deciding to enter into the October 1999 restructure of the indebtedness,
GCM relied on Grant's audits of the financial statements of Interamericas and IFS for
the year ending December 31, 1998, which showed that the required book value ratio
was not met by Interamericas and IFS. Although GCM was aware that the 1998
audits showed that the book value ratio was not met, GCM opted not to foreclose
based on the book value deficiency because it had waived the book value ratio. Jorge
Hollander, a member of GCM's advisory committee, testified that GCM waived the
required book value ratio "since the beginning until April 2000." The failure of
Interamericas and IFS to meet the book value ratio was known by GCM, and the
deficiency was waived by GCM when the debt was restructured in October 1999.

 After the October 1999 restructure of the debt, Grant again audited
Interamericas and IFS for the year 1999. In this second audit, Grant discovered a $44
million "management fee" that was paid in December 1999 by IFS to a related entity. 
IFS asserted that the payment was for services that had been performed over several
years. Based on the newly-reported management fee, Grant added a note to the 1999
audit statements that it was restating the 1998 book value at $119 million, instead of
the value that was originally reported at $143 million. The audit statements also
show that the December 1999 book value of IFS was just under $135 million. The
management fee charge of $44 million was "made known" to Grant by February 21,
2000. Grant, however, did not inform GCM of the change in its audit for 1998 until
June 2000.

March 2000 Restructure that Relied on Grant's Audits and Deloitte's Valuations


 In early 2000, IFS hired Deloitte to perform a valuation of the market value of
the pledged stock "in accordance with the terms of the Agreement Concerning
Collateral." Deloitte's proposal to provide services to IFS expressly stated that
Deloitte was entitled to rely on and would not independently verify information
provided to it by IFS. Deloitte's first valuation of IFS's stock was based on the value
as of October 31, 1999.

 GCM filed a lawsuit against Interamericas and IFS after they failed to pay the
$12 million due January 31, 2000, and settlement negotiations ensued. During the
settlement negotiations, GCM received information in March 2000 that the valuation
by Deloitte was that IFS's stock was valued at around $153 million on October 31,
1999. Although GCM was aware that the value of IFS's stock on October 31, 1999,
was below the required market value ratio, GCM did not pursue the default, opting
instead to settle the dispute on March 21, 2000. The settlement provided that GCM
would receive the $12 million payment and the debt would again be restructured.

 The restructure involved the exchange of promissory notes on May 24, 2000.
As part of the restructuring, Blitz, a Panamanian corporation, was formed for the sole
purpose of holding IFS's debt. Under a "Commercial Loan Agreement" between
Blitz and IFS, Blitz loaned $74 million to IFS for the specific purpose of IFS
purchasing all of Interamericas's indebtedness to GCM. At the same time, GCM
loaned Blitz $74 million. Under the terms of the agreement between Blitz and GCM,
Blitz would pay GCM when IFS paid Blitz. Thus, as of May 24, 2000, Interamericas
was no longer a party to any indebtedness; IFS owed $74 million to Blitz; and Blitz
owed $74 million to GCM. The agreements and notes between GCM and
Interamericas and IFS were no longer in effect.

Depletion of IFS's and Interamericas's Assets 

 In the months immediately preceding the March 2000 restructure that included
the formation of Blitz, IFS and Interamericas depleted a significant amount of assets. 
Mark Schwartz, an expert for GCM, testified that in late 1999 to early 2000, IFS
moved significant amounts of money into other entities, mostly offshore entities, that
never came back through loans or transfers. Because of the depletion of IFS's assets,
by March 2000, according to GCM's expert, there was "no way" GCM was going to
recover all of its money.

The Lawsuit by Blitz Against IFS

 After the decision to restructure the debt was made in March 2000 by
transferring IFS's debt to Blitz, Blitz sued IFS three months later, in June 2000, and
obtained a temporary restraining order prohibiting IFS from transferring assets. (4) On
April 17, 2001, a federal district court granted a judgment against IFS and in favor
of Blitz for $95 million for the promissory note, plus interest and attorney's fees. 
Only $2 million has been collected on the judgment due to the declaration of
bankruptcy by IFS in August 2002. The effect of Blitz's uncollectible judgment
against IFS is that Blitz is relieved of the duty to pay the promissory note it has with
GCM because the terms of the agreement between Blitz and GCM were that Blitz
would pay GCM only when IFS paid Blitz. Thus, although GCM has, through
written documents, received "full satisfaction" of the debt with IFS by virtue of a
promissory note from Blitz, GCM contends that the promissory note is not collectible
under the terms of its agreement with Blitz because the terms provide that Blitz is
excused from payment on the note until it is paid by IFS and IFS is bankrupt and
unable to pay. GCM thus asserts that it has suffered a monetary loss of millions of
dollars, despite the existence of a promissory note that outwardly appears to satisfy
the debt. 

GCM's Claims Against Grant and Deloitte 

 GCM brought suit against Grant and Deloitte, claiming that, if GCM had
foreclosed on the debt instead of restructuring the debt, then it would have been able
to recover at least some of the debt. Specifically, against Grant, GCM sought
recovery for (1) "negligence/accounting malpractice," (2) common-law fraud, and (3)
negligent misrepresentation. GCM also sought punitive damages for gross
negligence or malice. There are two underlying bases of GCM's suit against Grant. 
First, GCM claims that Grant wrongfully failed to discover the $44 million
management fee when it conducted the audit of the 1998 financial statements
because, even though the fee was not paid until December 1999, Grant's audit should
have discovered the fee that, according to IFS, had been accruing over several years
before it was paid. GCM contends that had Grant discovered the $44 million
management fee and properly stated IFS's value for 1998 at $119 million instead of
$143 million, GCM would not have entered into the October 1999 restructure of the
debt because GCM would have had "more ammunition to fight in court for a
foreclosure." Second, GCM contends that, once Grant actually learned of the fee, it
wrongfully failed to inform GCM of its discovery until June 2000, when it was too
late to act on the information. According to GCM, had Grant informed GCM in
February 2000 about the change in the December 1998 value of IFS, GCM would
have sought foreclosure in March 2000, instead of restructuring the debt. 

 Against Deloitte, GCM sought recovery for (1) aiding and abetting violations
of the Texas Securities Act, (2) negligence, (3) negligent misrepresentation, (4)
conspiracy to commit fraud, (5) breach of fiduciary duty to a known third party, and
(6) breach of contract (as the third-party beneficiary to the contract). GCM also
sought punitive damages for malice and attorney's fees under the Texas Securities
Act and Texas Civil Practice and Remedies Code section 38.001. On appeal, GCM
asserts that it also sued Deloitte for fraud.

 In response to GCM's Texas Securities Act claims, Deloitte filed a motion for
summary judgment on multiple grounds, including that the note was not a security as
a matter of law, and the trial court granted the motion. The remaining claims were
tried to a jury. Grant and Deloitte moved for a directed verdict, asserting that GCM
had (1) failed to produce any evidence of damages because Blitz fully satisfied IFS's
debt to GCM through a promissory note and therefore GCM had no standing to bring
the suit; (2) failed to produce any evidence that a foreclosure in October 1999 or in
March 2000 would have been successful in recovering any of the debt owed by IFS
and Interamericas; and (3) failed to produce any evidence that GCM would have
foreclosed earlier had it received all the information that it alleges it should have
received. The trial court granted the direct verdict on these grounds, which pertain
to every cause of action asserted by GCM. 

 Grant and Deloitte also made separate motions for directed verdict. Grant
moved for a directed verdict on the ground that Grant's alleged wrongful acts did not
cause GCM's harm because GCM had waived the book value ratio as a ground for
default on the debt. Deloitte moved for a directed verdict on the grounds that (1)
GCM's negligent misrepresentation claim against Deloitte failed because there was
no evidence that the valuation was "false" or that Deloitte made a misrepresentation
for a known purpose, (2) there was no evidence that Deloitte conspired to commit
fraud, (3) GCM had impermissibly "fractured" a claim for professional malpractice
into multiple causes of action, (4) limitations barred claims against Deloitte, and (5)
there was no evidence to support an award of punitive damages against Deloitte. The
trial court granted both motions.

Directed Verdict on Damages

 In its third issue, GCM contends that the trial court erred by granting the
directed verdict against it on the element of damages, which it claims were proven
through its expert Schwartz. (5) The trial court granted the directed verdict on the
ground that GCM failed to produce any evidence that a foreclosure on IFS's assets 
would have resulted in recovery of any of the debt owed by IFS and Interamericas to
GCM. (6) Grant and Deloitte assert that the evidence fails to show any damages caused
to GCM by restructuring the debt instead of foreclosing on the debt. The parties do
not dispute that IFS had assets in October 1999 and March 2000 that could have been
used to satisfy at least some of the outstanding indebtedness to GCM. Thus, the
dispute is whether any evidence shows that, assuming GCM had foreclosed instead
of restructuring the debt in either October 1999 or March 2000, the initiation of
foreclosure proceedings against IFS by GCM in either October 1999 or March 2000
would have, in reasonable probability, been successful in recovering any of IFS's
assets while they were still available.

 In regard to Grant, GCM contends that, based on Grant's erroneous information
about IFS's 1998 book value, it suffered damages resulting from GCM's decision to
restructure rather than foreclose in October 1999 and March 2000. In regard to
Deloitte, GCM contends that, based on Deloitte's erroneous information about the
1999 market value of IFS, it suffered damages resulting from GCM's decision to
restructure rather than foreclose in March 2000.

A. Directed Verdict Standard of Review

 A directed verdict in favor of a defendant is proper when the plaintiff does not
present evidence that raises a fact issue essential to the plaintiff's right of recovery,
or when the plaintiff admits or the evidence conclusively establishes a defense to the
plaintiff's cause of action. Prudential Ins. Co. v. Fin. Rev. Servs. Inc., 29 S.W.3d 74,
77 (Tex. 2000). In reviewing a directed verdict, the standards are the same as a legal
sufficiency challenge. City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005). 
We "[c]redit[] all favorable evidence that reasonable jurors could believe and
disregard[] all contrary evidence except that which they could not ignore." Id. at 830. 
A directed verdict would be improper if the evidence is within a "zone of reasonable
disagreement." See id. at 822. When a trial court directs a verdict without stating the
specific ground or grounds on which it is relying, the verdict must be upheld if any
of the grounds stated in the motion for directed verdict is meritorious. Prather v.
Brandt, 981 S.W.2d 801, 805 (Tex. App.--Houston [1st Dist.] 1998, pet. denied).

B. Proof of Damages

 A plaintiff must produce some evidence from which the fact finder could
reasonably infer that the damage sued for has resulted from the conduct of the
defendant. McKnight v. Hill & Hill Exterminators, Inc., 689 S.W.2d 206, 209 (Tex.
1985). The evidence of damages must be based on more than a "suspicion or
surmise." Id. "Uncertainty as to the fact of legal damages is fatal to recovery, but
uncertainty as to the amount will not defeat recovery." Id. at 207. Damages that are
"remote, contingent, and not . . . a proximate result of the acts of which complaint is
made" may not be recovered. Miller v. Bank of Commerce, 387 S.W.2d 691, 691-92
(Tex. Civ. App.--Fort Worth 1965, no writ) (holding "actual damage could be no
more than a matter of conjecture" under circumstances showing that defendant
induced creditor to delay in collecting on debt and delay later barred creditor's claim
because defendant filed bankruptcy). 

 To prove damages, the plaintiff must produce evidence that the defendant's
conduct "caused an event and that event caused the plaintiff to suffer compensable
damages." See Keo v. Vu, 76 S.W.3d 725, 731 (Tex. App.--Houston [1st Dist.] 2002,
pet. denied); see also Sunshine Mining and Refining Co. v. Ernst & Young, L.L.P.,
114 S.W.3d 48, 52 (Tex. App.--Eastland 2003, no pet.) (holding that there was no
causal link between auditor's actions and company's damages because "there must
be some evidence that the spring stock offering would have been successful in order
for [the company] to establish the causal link for the damages it seeks"). Proof of
actual damages must be based on objective facts or data and must be more than
conjecture. See Carter v. Steverson & Co., 106 S.W.3d 161, 165-66 (Tex.
App.--Houston [1st Dist.] 2003, pet. denied) (noting that lost profits damages must
be based on objective facts or data, not speculative or uncertain evidence). 

 A directed verdict, however, is improper if the plaintiff produces some
evidence of a reasonable basis for determining his loss, even if the exact amount is
not ascertainable or is contradicted by other evidence. See Vance v. My Apartment
Steak House of San Antonio, Inc., 677 S.W.2d 480, 483-84 (Tex. 1984); Field v. AIM
Mgmt. Group, Inc., 845 S.W.2d 469, 472 (Tex. App.--Houston [14th Dist.] 1993, no
writ).

 We must determine, therefore, whether any evidence in the record shows, in
reasonable probability, damages from GCM's decision to renegotiate the debt rather
than to seek foreclosure proceedings in October 1999 or March 2000. See McKnight,
689 S.W.2d at 209.

C. The Evidence

 Schwartz testified that IFS assets were available in October 1999 and March
2000 if foreclosure on those assets had been accomplished at that time. (7) Schwartz
said that "the amount of assets that could have been realized by GCM had it
foreclosed on IFS in October 1999 was approximately $77.3 million." Schwartz also
testified that the "most conservative" number for GCM's possible recovery from
IFS's assets was $67.5 million, which was based on the percentage of outstanding
shares that IFS had actually pledged to GCM. These IFS assets included
approximately $19 million in cash in October 1999. Schwartz testified that on
October 31, 1999, IFS and Interamericas "had sufficient moneys and would have had
sufficient moneys to pay the debt to GCM." 

 On December 31, 1999, IFS had a net value of $143 million, as shown in
Grant's audit, and one month later, on January 31, 2000, IFS had a fair market value
of $118 million, as shown in Deloitte's valuation. During the period of time between
late 1999 and early 2000, significant assets valued between $90 and $150 million 
were depleted from IFS and placed into mostly offshore accounts, with no return in
assets to IFS, according to Schwartz. Schwartz testified that, in his review of
documents and information provided by GCM's attorneys and Hollander, he "saw
evidence of assets moving out and not coming back in the system" beginning in late
1999 and early 2000. (8) 

 By the time of the March 2000 settlement and agreement to restructure the $74
million debt, Schwartz said that IFS had $29.9 million in "assets available." 
Schwartz arrived at the $29.9 million figure by deducting costs for collecting on the
debt from the larger amount of $34 million in available assets. Of the $29.9 million
in net assets, Schwartz said that only $13.3 million in assets would have been
available if GCM had recovered "nothing but the value of the shares actually
pledged." Schwartz reached the figure of $13.3 million by apparently accounting for
the amount that would have been necessary to redeem the outstanding shares of
preferred stock.

 Because of the significant depletion of IFS assets, Schwartz acknowledged that
by March 2000, "there was no way GCM was going to get all its money." Schwartz
explained that by March 2000, GCM was in a "work-out situation," which he
described as follows:

 In a credit arrangement borrower/lender, when the loan, the operations
of the business, begin to deteriorate and the loan performance, the ability
to come to service the loan comes into question, you often find that the
bank or lender will put the loan in work-out where they're trying to
maximize the recovery and figure out a strategy that will get them
repaid, because [sic] on other than the agreed terms, because the agreed
terms, the loan's not going to repay. Any number of factors, the work-out can take out any number of different ways, debt for dividends,
interest for bearers, renegotiation. 


Schwartz acknowledged that in a work-out situation, "lenders frequently agree to
things that they would not normally agree to in order to try to preserve some value"
because "the lender is just trying to make the best of a bad situation." Schwartz
agreed that "the lender may believe that over the long run they can recover more by
restructuring than by incurring the cost of foreclosure and liquidation." 

 Schwartz related that IFS was no longer in operation as of March 2000 and the
only source of payment that GCM would have had was through the sale of the assets
of IFS. (9) Schwartz explained that "when you are looking at essentially the assets to
pay off the debt, the value of those assets and their retention of value becomes critical
to your recovery." Schwartz testified that he was determining the "value of the assets
available to pay the debt or at least pay some on the debt." Schwartz said he was
"looking at just generally the availability of assets to pay the debt." Schwartz
acknowledged that he was not offering an opinion on what GCM might have realized
by foreclosing on the shares and attempting to liquidate IFS's assets, but only that
there was value in IFS. (10) 

D. Analysis 

 GCM asserts that it has produced some evidence of damages because (1) it
would have become the majority shareholder if it had foreclosed on IFS's stock; (2)
IFS had assets available to satisfy some or all of the debt; and (3) Schwartz took the
costs of collection of the debt into account when he gave his figures on the available
amounts. 

 1. Majority Shareholder 

 GCM asserts that had it foreclosed on IFS's stock in October 1999 or March
2000, it would have become the majority shareholder of IFS and would have
recovered not only the value of the stock, but it also could have liquidated IFS's
assets to recover the debt owed. Schwartz, however, did not offer an opinion on the
value of the collateral, the shares of IFS. Schwartz stated that he was not offering an
opinion "as to the value of the IFS common stock as to any point in time." Thus,
there is no evidence of the value of the collateral--the shares of stock of IFS--in
either October 1999 or March 2000. 

 GCM contends that regardless of the value of IFS's stock, foreclosure on the
collateral would make GCM the majority shareholder of IFS, and GCM could have
then liquidated the assets of IFS to satisfy the debt. But even assuming that
foreclosure proceedings would have enabled GCM to become the majority
shareholder in IFS, GCM produced no evidence to show, in reasonable probability, 
that if it had succeeded at liquidating the assets, what the value of those assets would
have been had the liquidation occurred. Schwartz did not testify to what GCM would
have realized by foreclosing and liquidating IFS's assets, but only that there was
some value in IFS in October 1999 or March 2000, when foreclosure proceedings
could have been initiated. GCM, thus, offered no evidence showing that a foreclosure
initiated in late October 1999 or in March 2000 would have resulted in the recovery
of any of the indebtedness.

 No direct evidence shows that foreclosure proceedings would have resulted in
GCM's capturing any of IFS's available assets, and the record does not support any
such inference. To the contrary, the only reasonable inference from the record is that
assets could not have been reached through foreclosure proceedings beginning in
October 1999 or March 2000. In October 1999, GCM was in litigation with IFS and
Interamericas, and there was an injunction in place preventing GCM from
accelerating or foreclosing on the debt. To begin foreclosure in October 1999, GCM
would have had to first convince the court to lift the injunction to allow the
foreclosure proceedings that were prohibited. (11) Even assuming that GCM could have
convinced the court to lift the injunction to allow the foreclosure to proceed, no
evidence shows, in reasonable probability, what would have been the result of
foreclosure proceedings. 

 The direct evidence from GCM's advisory committee member Hollander also
suggests that it would not be reasonable to infer that foreclosure could have actually
resulted in the acquisition of IFS's assets. Hollander testified that one of the reasons
that he restructured in October 1999 instead of foreclosing was that the types of
default that existed, namely the non-compliance with the book value ratio and IFS's
delinquency in producing monthly unaudited financial statements, were not the types
of defaults that would cause a court to turn over control of IFS by foreclosing on the
majority of outstanding shares of stock. Although knowledge of the $44 million
restatement would have given GCM, in Hollander's words, "more ammunition to
fight for a foreclosure," no evidence shows that the information would have resulted
in a reasonable probability that GCM could have foreclosed on IFS's collateral. We
cannot conclude that the evidence reasonably supports an inference that foreclosure
proceedings initiated by GCM in October 1999 could have resulted in GCM's ability
to capture any amount of IFS's assets.

 By March 2000, IFS's assets were significantly depleted, and no evidence
shows in reasonable probability what the result of foreclosure proceedings started in
March 2000 would have been. There is simply no evidence that a foreclosure would
have been any more successful at recovering any of the IFS debt than the restructure
of the debt.

 2. Assets Available 

 There is evidence that IFS had recoverable assets available in October 1999
and March 2000. The record is silent, however, on whether, in reasonable
probability, any of the available assets could have been recovered had GCM decided
to initiate foreclosure proceedings on IFS's debt in either October 1999 or March
2000, rather than restructure the debt. As discussed more fully above, the collateral
for IFS's indebtedness was stock in IFS, not in the underlying assets, and no evidence
connects foreclosure on those shares with an ability to collect any amount of assets
that was available in October 1999 or March 2000. We conclude that the mere fact
that IFS had assets available in October 1999 or March 2000 does not establish that
in reasonable probability any amount of those assets could have been actually
recovered by foreclosure proceedings initiated on those dates. 

 3. Cost of Foreclosure

 GCM asserts that Schwartz testified about the costs of foreclosure, discounts
to be applied to any assets, and the "steps that Plaintiffs were required to take in order
to foreclose." Schwartz did not testify about the necessary steps for foreclosure on
assets or the reasonable probability of GCM's ability to collect any amount through
the foreclosure proceedings. Although Schwartz estimated the costs of collection for
a foreclosure in March 2000, (12) he did not describe how any amount of the assets
could have been obtained by foreclosure proceedings that began in October 1999 or
March 2000. Although Schwarz testified that he deducted the costs of foreclosure
from the available amount of assets, his testimony constitutes no evidence of the
actual damages incurred by GCM as a result of not foreclosing in October 1999 or
March 2000.

 4. The Deloitte Valuations and Grant Audits

 In its reply brief and in its motions for rehearing, GCM contends that the Grant
audits and the Deloitte valuations are some evidence of the value of IFS. 
Specifically, in its first motion for rehearing, GCM asserts,

 Clearly, the audit report and the appraisals present much more than a
scintilla of evidence of the value of the IFS shares, they provide direct
evidence of the ability of GCM to recover damages, enough so to shift
the burden to Appellees to come forward with evidence to the contrary. 
The anomaly of Appellees' position is obvious. They claim the values
in their audit reports and appraisals are correct, yet deny any value in
IFS when the damages are presented. Texas courts have long
recognized that a party can be equitably estopped from taking
inconsistent positions in judicial proceedings. . . . Allowing them to
obtain a verdict in their favor based on their claim that the valuations
were correct, while allowing them to argue that IFS had no value from
which to collect GCM's debt would be an injustice. 

Deloitte, in part, responds that it is GCM that cannot "argue that the valuations
accurately reflect some minimum value of IFS, to which GCM would have been
automatically entitled" because GCM claimed that the valuations were "inflated and
unreliable."

 "'Assertions of fact, not plead in the alternative, in the live pleadings of a party
are regarded as formal judicial admissions.'" Holy Cross Church of God in Christ v.
Wolf, 44 S.W.3d 562, 568 (Tex. 2001) (quoting Houston First Am. Sav. v. Musick,
650 S.W.2d 764, 767 (Tex. 1983)). "A judicial admission that is clear and
unequivocal has conclusive effect and bars the admitting party from later disputing
the admitted fact." Id. (citing Gevinson v. Manhattan Constr. Co., 449 S.W.2d 458,
467 (Tex. 1969)).

 In its live pleading before the trial court, GCM alleged the following facts
regarding the Grant audits:

  the audits contained a "combination of non-disclosure of
expenses and overstatement of assets [that] created a grossly
misleading picture of IFS' financial condition" during the
relevant periods;


  Grant negligently failed "to determine that IFS's financial
statements did not fairly present IFS' financial condition in all
respects";


  Grant concealed "IFS's true financial status from [GCM], as well
as the relevant state and federal authorities";


  Grant negligently failed "to disclose that IFS's 1998 and 1999
financial statements contained material misstatements and grossly
misstated IFS' financial condition";


  Grant negligently "overvalu[ed] assets" of IFS; and


  Grant committed common law fraud by failing to disclose that its
earlier opinion--that IFS's financial statements "presented the
financial condition of IFS fairly in all material respects"--was in
fact false.


(Emphasis added).


 GCM alleged the following concerning the Deloitte valuations:

  they "were seriously flawed";


  they "contained gross errors and negligent misrepresentations";


  Deloitte negligently "failed to determine in its valuations that the
stocks and receivables were worthless or worth millions of
dollars less than represented by IFS";


  Deloitte negligently "overvalued IFS by millions of dollars" in the
first valuation and this carried over into subsequent valuations;


  Deloitte caused GCM's damages because the "flawed valuations"
prevented GCM from being able to convince a court that its debt
was under-collateralized;


  Deloitte's valuations were a "massive overvaluation of IFS";


  the valuations contained "faulty, misrepresented information" and
"errors in the valuations";


  Deloitte assisted Pimienta in making "false misrepresentations
and omissions of facts regarding the value of IFS";


  Deloitte's valuations contained "mistakes in the valuations
regarding the total assets in the report"; and


  Deloitte, acting fraudulently with Pimienta, made "material
misrepresentations to [GCM] concerning the amount and status
of the collateral that secured IFS's debt."


(Emphasis added).

 These allegations of Grant's and Deloitte's wrongful acts were not made in the
alternative. Further, the inaccuracy of the audits and valuations forms the basis of
GCM's theory of liability. If they are not inaccurate, GCM could not have been
harmed by relying on them--as it alleges in its petition. Finally, in arguing the
directed verdict before the trial court, GCM did not assert that the audits and 
valuations were accurate enough to provide an estimate of GCM's value.

 Here, as a basis for liability, GCM made assertions of fact that were not
pleaded in the alternative and that were clear and unequivocal. See Holy Cross, 44
S.W.3d at 568. Accordingly, these assertions are judicial admissions that are binding
upon GCM. See id. Therefore, the audits and valuations do not provide some
evidence of what GCM could have recovered in a foreclosure in either October 1999
or March 2000--the theory of damages alleged by GCM. (13), (14)

 5. The Loan Documents

 In its reply to Grant's and Deloitte's response to its first motion for rehearing,
GCM contends that this Court erred in its original opinion in this case by discussing
the "perceived difficulties in foreclosing on the IFS assets" because of the "ease with
which foreclosure occurs under the loan documents." (15) Specifically, GCM asserts
that the loan documents provided that Chase Bank was the custodian of the
collateral--the shares of IFS. GCM then asserts that "[i]n the event of default" 
Chase Bank would turn over the shares at GCM's demand. (16) GCM could then hold
an emergency shareholders' meeting and elect new officers and directors for IFS
"strip[ping] Pimienta of any authority to act for IFS." This, contends GCM, would
have prevented Pimienta from transferring any assets and given GCM the ability to
dispose of the assets. (17) GCM finally asserts that the ease of foreclosure was further
shown because "[i]f IFS chose to contest the turnover, it was required to do so in fast
moving arbitration." 

 GCM also contends that the events "that took place after the CLA restructure
in May 2000 . . . have little relevance to events that could have taken place in October
1999 or March 2000, because after May 2000, the parties were operating under
entirely new loan documents, and because the passage of time had allowed Pimienta
to move assets out of reach."

 Grant responds that in October of 1999, when GCM claims that it relied upon
Grant's audit to its detriment, there was still an injunction in place preventing GCM
from foreclosing. Grant further points out that, under the Uniform Commercial Code
(UCC), merely taking possession of the collateral (the shares of IFS) was not enough
for GCM to become the holder of the shares and thus able to vote on them and take
control of IFS. Rather, the requirements of the UCC would have to be met, and there
was no evidence regarding these necessary steps. (18) Finally, in a point that Deloitte
also makes, Grant asserts that looking to the actual foreclosure that Blitz initiated in
June of 2000 is appropriate because Hollander testified that each restructuring put
GCM and Blitz in a better position regarding its indebtedness.

 First, throughout its brief and motions for rehearing, GCM speaks of
foreclosing on the assets of IFS. However, the collateral for the loans were shares of
IFS--not the assets. GCM presented no evidence of the value of those shares. (19) 
Thus, even if GCM was able to easily take possession of the shares, under its theory
of damages, it still would have to contend with Pimienta, (20) convert possession of the
shares into control of IFS, and then take control of and liquidate IFS's assets. 
However, Schwartz only testified that IFS had assets with some value from which
GCM could have recovered. (21)

 GCM's assertion that we should not consider the events surrounding the
eventual foreclosure in June 2000 is inconsistent with the evidence it presented at
trial. Hollander testified that the restructuring gave Blitz more favorable terms and
conditions than GCM had previously. Thus, the only reasonable inference is that an
earlier foreclosure would have been more difficult than the one that actually took
place.

 6. Conclusion

 GCM stated its theory of damages to the trial court as follows:

 We are trying to collect the money that GCM would have had if it had
chosen to foreclose in October, or it had later chose[n] to foreclose in
March. That is what we are trying to recover.


 GCM, however, did not present any evidence to provide the trier of fact a
reasonable basis for determining the amount of money that it would have recovered
had it sought foreclosure in October 1999 or March 2000. It is undisputed that when
Blitz attempted to foreclose on the debt in June 2000, IFS actually transferred its
assets to other entities in violation of the court order and then declared bankruptcy,
making the debt uncollectible. GCM failed to produce any evidence that foreclosure
proceedings initiated three months earlier in March 2000 or nine months earlier in
October 1999 would have enabled it to acquire any assets of IFS. Even if GCM had
opted to foreclose and began foreclosure proceedings on the collateral of IFS, there
is no evidence in the record that any such foreclosure would have actually resulted
in GCM's ability to take possession of the majority stock of IFS, or the value of that
stock. Furthermore, even if GCM had taken possession of the stock to become the
majority shareholder, there is no evidence that any assets would have been reached
through liquidation of the IFS assets when that would have occurred at some time
following the foreclosure proceedings. See Sunshine Mining and Refining Co., 114
S.W.3d at 52 (holding that there was no causal link between auditor's actions and
company's damages because "there must be some evidence that the spring stock
offering would have been successful in order for [the company] to establish the causal
link for the damages it seeks"); Keo, 76 S.W.3d at 731.

 Thus, GCM presented no evidence of any damages resulting from its decisions
in October 1999 and March 2000 to restructure IFS's debt. GCM presented no basis
for a jury to determine, with reasonable certainty, the amount of "money that GCM
would have had if it had chosen to foreclose." See Formosa Plastics Corp. USA v.
Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 50 (Tex. 1998) (holding that
there was no evidence that plaintiff would have obtained contract had its bid been
lower); Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 650 (Tex. 1994) (holding
that there was no evidence that plaintiff could have retained accounts for any period
of time because account holders could transfer accounts at will); Miller, 387 S.W.2d
at 692 (holding that, because it was not certain creditor's effort to collect debt would
have been successful, there was no evidence of damages). (22) GCM's expert on
damages, Schwartz, acknowledged that he was not offering an opinion on what GCM
might have realized by foreclosing on the shares and attempting to liquidate IFS's
assets, only that there was some value from which GCM could recover some part of
its debt. Accordingly, we hold that the trial court did not err by granting a directed
verdict in favor of Grant and Deloitte on the ground that GCM presented no evidence
of damages. (23) See City of Keller, 168 S.W.3d at 813 (noting that evidence is not
legally sufficient "if jurors would have to guess whether a vital fact exists").

 In support of its arguments, GCM relies on Vance and Field, but both cases are
factually distinguishable. In those cases, the evidence established some amount for
the damages, but here no evidence and no reasonable inference from the evidence
shows any amount of damages caused by GCM's decision not to foreclose. See
Vance, 677 S.W.2d at 484 (holding that directed verdict was improper on element of
damages because some evidence showed reasonable basis for determining party's
loss, even though exact amount of damages could not be ascertained and there was
substantial conflict in evidence with regard to exact cost of repairs); Field, 845
S.W.2d at 472 (holding that directed verdict was improper on element of damages
because plaintiff recited amount for which stock could have been sold, stockbroker
testified regarding probable value of stock, and AIM executive related how much was
eventually paid for plaintiff's AIM stock). In its first motion for rehearing, GCM
again cites these cases, explaining them in the following parenthetical: "holding a
directed verdict is improper if the plaintiff produces some evidence of a reasonable
basis for determining his loss, even if the exact amount is not ascertainable or
contradicted by other evidence." This is correct. A party seeking damages must
present some evidence of a reasonable basis for determining his loss. The proof of
damages fails here because no evidence shows a reasonable basis for determining the
loss to GCM.

 In its first motion for rehearing, GCM also asserts that there is no Texas case
"directly on point on how to calculate damages when one is wrongfully prevented
from foreclosing," but that "[c]ourts in other states have had no problem upholding
damages." The lone authority that GCM identifies is Brown v. Critchfield, 161 Cal.
Rptr. 342 (Cal. Ct. App. 1980). (24) In Brown, the plaintiff sued his former attorney and
real estate agent alleging that their fraud, negligence, or breach of fiduciary duties had
damaged him. Id. at 344. The plaintiff had sold real property and retained a deed of
trust to secure the purchaser's indebtedness. Id. at 345. The plaintiff released 15.56
acres to the purchasers, who later sold the property for $335,000. Id. The plaintiff
brought suit against his real estate agent and attorney, alleging that because of their
failure to inform him that the purchasers were in default at the time he released the
15.56 acres, he was damaged by that erroneous advice. Id. at 344. The plaintiff
alleged that he was damaged in the amount that the purchasers received--$335,000. 
Id. at 351. The trial court granted summary judgment for the defendants on the
grounds that the damages alleged by the plaintiff were not recoverable as a matter of
law and the plaintiff had therefore failed to state a cause of action. Id. at 344.

 The court noted that the plaintiff's alleged measure of damages was wrong. Id.
at 351. However, the court stated the general rule that "[u]ncertainty as to the fact of
damage, that is, as to its nature, existence or cause of the damage, is fatal" to a
plaintiff's cause of action. Id. at 350. The court also stated that "recovery will not
be denied because the damages are difficult of ascertainment." Id. at 351. The court,
after analyzing the California anti-deficiency legislation and concluding that it did not
bar the plaintiff's damages, noted that there were three alternatives showing how
plaintiff was damaged by the erroneous advice of his agent and attorney. (25) Id. at
350-51. The court noted that it did not matter which of these was correct, because
the plaintiff had adequately alleged the fact of damages. Id. at 351. The court
therefore reversed the summary judgment. Id.

 Brown is distinguishable from this case. First, it involved a summary judgment
as a matter of law concerning the adequacy of the pleadings, not a motion for directed
verdict due to no evidence of damages. As the Brown court stated in the opinion,
"The sole issue on appeal is whether plaintiff has alleged damages sufficient to
support his causes of action for fraud and negligence." Id. at 345. Further, based on
the statement in Brown, it appears that the general rule in California is in accord with
Texas law--that uncertainty as to the fact of damages is fatal to recovery, but the fact
that damages are incapable of precise calculation is not. Compare id. at 350-51 with 
McKnight, 689 S.W.2d at 207. The plaintiff in Brown adequately alleged that the
wrongful act of defendants caused him some damages. Brown, 161 Cal. Rptr. at 350. 
Here, our analysis of the law and the evidence leads us to the conclusion that GCM
did not present any evidence from which a trier of fact could determine with
reasonable certainty the amount of damages caused by Grant's and Deloitte's alleged
misconduct--an issue not addressed in Brown. We therefore conclude that Brown
is not persuasive in this context.

 We overrule GCM's third issue.

GCM's Texas Securities Act Claims

 In its eleventh issue, GCM contends that the trial court erred by granting
summary judgment for Deloitte on GCM's claims for violations of the Texas
Securities Act because the Commercial Loan Agreement (CLA) is a security.

 "If summary judgment may have been rendered, properly or improperly, on a
ground not challenged, the judgment must be affirmed." Ellis v. Precision Engine
Rebuilders, Inc., 68 S.W.3d 894, 898 (Tex. App.--Houston [1st Dist.] 2002, no pet.);
see also Jacobs v. Satterwhite, 65 S.W.3d 653, 655 (Tex. 2001) (holding appellate
court may not reverse judgment on grounds not raised and argued on appeal); San
Jacinto River Auth. v. Duke, 783 S.W.2d 209, 209-10 (Tex. 1990) (same). That the
CLA was not a security is only one of the grounds that Deloitte asserted as a basis for
its motion for summary judgment. GCM does not attack any other ground for
summary judgment. We therefore affirm the summary judgment with respect to
GCM's Texas Securities Act claims. See Ellis, 68 S.W.3d at 898.

 In its first motion for rehearing, GCM contends that the trial court did not grant
summary judgment without specifying the grounds for it. GCM contends that the
reporter's record shows that the trial court expressly only considered the point that
it now attacks on appeal (that the Commercial Loan Agreement was not a "security")
and no other. 

 A judge's oral comment at a hearing on a motion for summary judgment cannot
be used to specify the ground upon which summary judgment was granted. 
Richardson v. Johnson & Higgins of Tex., Inc., 905 S.W.2d 9, 11 (Tex.
App.--Houston [1st Dist.] 1995, writ denied). "It is the court's order that counts, not
the stated reason or oral qualifications." Id.; see also Ajudani v. Walker, 177 S.W.3d
415, 417-18 n.3 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (following
Richardson). Here, the trial court's order states, 

 The Court, having considered [another party's motion] and the motion
for summary judgment filed by Deloitte & Touche LLP ("Deloitte"), as
well as any timely-filed response, hereby ORDERS as follows:


 The motions for summary judgment are granted in Part and
all of Plaintiffs' causes of action against [the other party]
and Deloitte asserted under the Texas Securities Act are
hereby dismissed.


The trial court's order simply states that Deloitte's summary judgment on the Texas
Securities Act claim was granted. The order does not specify any specific ground. 
Because the order itself did not specify the grounds, the trial court's oral comments
at the hearing cannot be the basis for specifying a particular ground upon which
summary judgment was granted. See Ajudani, 177 S.W.3d at 417-18 n.3;
Richardson, 905 S.W.2d at 11. (26)

 We overrule GCM's eleventh issue.

 Having overruled GCM's third and eleventh issues, we need not reach GCM's
first, second, (27) and fourth through tenth (28) issues, nor Grant's two cross-points. (29)

Conclusion

 We affirm the judgment of the trial court. All pending motions are dismissed
as moot.

 



 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justice Jennings.
1. Rule 41.1(b) of the Texas Rules of Appellate Procedure provides, in pertinent part,


 After argument, if for any reason a member of the panel cannot
participate in deciding a case, the case may be decided by the two
remaining justices. 


 Tex. R. App. P. 41.1(b).
2. Blitz sought no independent relief in the case, but sued as a "necessary party."
3. The market value ratio required that the market value of the pledged shares of IFS
stock be at least 1.5 times the total debt owed by Interamericas and IFS to GCM. The
book value ratio required that the book value of the stock be at least 1.3 times the total
debt.
4. After Blitz filed its lawsuit, GCM and Blitz received from Deloitte, on July 2000,
Deloitte's business valuation of IFS "as of January 30, 2000," which showed that IFS
had a significant value of $118 million. Later that year, in November 2000, GCM and
Blitz received Deloitte's business valuation of IFS "as of June 30, 2000," which still
showed a significant value of $48 million.
5. Deloitte moved for directed verdict on this ground, asserting that "there is no
competent, credible evidence of what amount of money would have been collected"
had GCM attempted to foreclose in October or March and, therefore, "there is no
evidence that the jury could conclude what the damages are." Grant joined in this
motion.
6. At the hearing on the directed verdict, the trial court stated, "Actually, you've got no
evidence as I recall of any of your experts saying what would have been recovered."
7. Schwartz testified as follows:


 [Attorney]: What we put in front of the jury with respect to March is your expert
opinion as to what could have been acquired, foreclosed?


 [Schwartz]: Had GCM - - 


 [Attorney]: If GCM had exercised its right to foreclose, this is the amount of money
you would have expected to recover from the assets?


 [Schwartz]: Yes.


 [Attorney]: And the same is true for October. If they had seized the assets in
October?


 [Schwartz]: Yes.
8. Schwartz gave examples of how the money was transferred out of IFS. Schwartz
stated that IFS invested $24 million in a start-up company called Pueblo, by the spring
of 2000, a lot of loans were made to a company called UNI, $3 million was loaned to
a company called Larce in February 2000, $13 million was loaned to a company
called Southsea before March 2000, $4.5 million was loaned to a company called
Northsea before March 2000, and the $44 million management fee was paid sometime
in late 1999 or early 2000. Schwartz also testified that additional transfers were made
after March 2000, although he did not identify specific transactions.
9. In its first motion for rehearing, GCM asserts that this Court erred in its original
opinion by stating that "IFS was no longer in operation as of March 2000 and the only
source of payment that GCM would have had was through the sale of the assets of
IFS." Specifically, GCM contends that this Court did not indulge every reasonable
inference in its favor, as required by the standard of review, because the Deloitte
valuation as of June 30, 2000, was made "under the premise of value as a going
concern business enterprise with continuing operations," and because Hollander
testified that IFS was "partially liquid" in March 2000.


 GCM attempted to prove damages through Schwartz. The damages claimed by
Schwartz were premised on his assessment that IFS was no longer in operation. 
Hollander's testimony that IFS was partially liquid, therefore, is not pertinent to the
testimony by Schwartz, whose opinion concerning damages was premised on the
assessment that IFS was no longer in operation. We also note that although GCM
asserts that Deloitte's June 30, 2000 valuation was premised on the continued
operations of IFS, this is a newly asserted theory in its first motion for rehearing that
is contrary to the theory asserted at trial. In its petition at trial, GCM asserted that
"the transfer of the last hard operating asset and cash of IFS" occurred in May 2000.
10. Schwartz testified about his calculations as follows:


 [Attorney]: . . . . The damage calculations that you've put before the Court and the
jury today, those are hypothetical numbers with respect to what might
have been recovered, aren't they?


 [Schwartz]: I'm sorry, which ones are we talking about? 


 [Attorney]: The ones in October, either one of the ones in October?


 [Schwartz]: Hypothetical, what we are trying to do is get an estimate that there
appeared to be sufficient assets to pay the debt in October. That's what
that does for me.


 [Attorney]: But you're not offering any opinion that any of those assets could or
couldn't have actually been realized upon, are you?


 [Schwartz]: Well, we know that some of them are realized upon. We know they've
raised $80 or $90 million from the sale of two subsidiaries between
October and January. There's information that there's value there. I
mean, I'm not opining that that is the number that would have been
realized.


 Schwartz also testified,


 [Attorney]: I understand. But your objective is the same, right, to estimate the
amount of or the value of assets available to pay the debt as of that
point in time?


 [Schwartz]: The value of the assets available to pay the debt or at least pay some on
the debt.
11. In its first motion for rehearing, GCM asserts that this Court engaged in "an
incomplete analysis of the evidence" regarding the injunction that was in place in
October of 1999. In its entirety, GCM's first rehearing motion on this point states:


 The Panel states that "GCM would have had to first convince the court
to lift the injunction to allow foreclosure proceedings." This is not so
much an error as it is an incomplete analysis of the evidence. The
federal court had already required IFS to make a $21 million deposit in
the registry of the court by November 1, 1999, as a condition of
keeping the injunction. By the time of the October 1999 restructure,
IFS had not made the deposit, but instead renegotiated. The logical
inference is that the TRO could have been easily vacated if the deposit
were not made.


 The only evidence that GCM identifies in its first rehearing motion is evidence that
the November 1, 1999, deadline existed and that the case was settled on October 27,
1999, by the October debt restructure. GCM asks that we assume that IFS would not
have made the required $21 million deposit into the registry of the court by November
1, 1999, and that we therefore must assume that the court would have lifted the
injunction. We cannot make those assumptions, however, because the undisputed
evidence is that IFS paid $20 million to GCM in the weeks following the October
1999 restructure. No evidence supports making those assumptions.


 In its second motion for rehearing, GCM asserts that the injunction "has no relevance
as to whether a foreclosure could have taken place in March 2000." We agree. We
have not considered the injunction with respect to the possible foreclosure in March
2000.
12. Schwartz merely reduced the value of the assets that he said were available from
approximately $34 million to $29.9 million. He did not explain why he chose that
amount. Schwartz did not offer any testimony on the amount for costs of foreclosure
in October 1999.
13. GCM also appears to contend that, because it did not allege the third Deloitte
valuation as a basis for liability, the third valuation provides some evidence of IFS's
worth and is close in time to the March foreclosure. First, as detailed above, GCM
alleges that all of the Deloitte valuations were "seriously flawed" and "contained
gross errors." Further, GCM repeatedly explains that the third valuation shows the
same value as the second, only changing because the assumption of Interamericas's
debt via the March restructuring appears for the first time on the third valuation. That
is, the second valuation shows a value of $118,800,000. After subtracting the
$70,000,00 indebtedness, IFS's value is $48,800,000--the amount shown in the third
valuation.
14. GCM cites to Smith v. Chipley, 16 S.W.2d 269 (Tex. 1929). GCM quotes the
following passages to support its argument: "To permit a party to . . . [make] a
representation as to a given state of facts, and thus obtain an advantage over his
adversary . . . and then . . . assert . . . the very matter disclaimed . . . would be contrary
to every principle of right, and will not be tolerated." Id. at 276. However, the
ellipses in the quote leave out important facts that show Smith is distinguishable from
this case. As the supreme court phrased the issue in that case:


 We are therefore confronted with this one question: Can Mrs. Chipley invoke the jurisdiction of the Supreme Court to grant her relief, basing
her grounds for relief on the plain and direct statement that the
partnership had been wound up, and that she had and claimed no
interest in the profits, and was not liable for any losses arising out of the
sale of the west one-half of said land, that there were no losses or
liabilities to be settled, that same had already been settled, that Smith
was entitled to all the profits, and liable for all the losses on said west
half; and many other statements of the same nature, and thus rightfully
or wrongfully, it being immaterial which, obtain a judgment in her
favor in the Supreme Court, and then later institute and maintain
another suit against the very same party on the very claim that she
disclaimed any interest in the first suit? We think that to state the
question is to answer it.


 Id. at 275-76. Here, neither Grant nor Deloitte have made representations to a court
to secure a judgment in its favor and then--in a subsequent proceeding--asserted a
claim inconsistent with those representations. Thus, Smith is not controlling in this
case. 
15. GCM cites to no authorities to support this point in its motion for rehearing.
16. Despite the defaults that existed and of which GCM was aware, GCM never made this
demand.
17. To support these assertions in its rehearing motions, GCM cites generally to the
Security Agreement, Agreement Concerning Collateral, the Basic Agreement, and the
Credit Agreement, without specifying any particular section. However, the section
that sets forth the remedies in the event of default (in the Security Agreement)
provides a procedure for GCM to sell the collateral--not a procedure for Chase Bank
to turn the shares over to GCM. The Security Agreement does provide that GCM
would have the voting rights of the shares during an "event of default," but that
section acknowledges that IFS or Pimienta would have to "give consents, ratifications
and waivers" to give these votes "the same force and effect as if [GCM] were the
owner" of the shares. 
18. For example, UCC section 9.620 provides a number of requirements for a secured
party to accept collateral in satisfaction of the debt, rather than conducting a
foreclosure sale. See Tex. Bus. & Com. Code Ann. § 9.620 (Vernon 2002).
19. GCM identifies the following testimony from Schwartz, the accountant who served
as GCM's damages expert, as some evidence of raising at least a fact issue with
respect to the value of the shares and, thus, the amount of damages:


 [Attorney]: Just by way of summing up. In your analysis, if in
October you recover nothing but the value of the
shares pledged, the shares that were in GCM's
hands, you get $67,500,000, correct?


 [Schwartz]: Correct.


 [Attorney]: The most conservative possible number?

 

 [Schwartz]: Yes.

 

 [Attorney]: And with respect to the most conservative
possible number as to March, it's 13,284,000?

 

 [Schwartz]: Correct.


 First, as detailed in the opinion, Schwartz clearly states that he is not giving an
opinion on the value of the shares (or what GCM might have recovered), only that IFS
had some assets available from which GCM might recover. Further, from the
phrasing of the questions and the overall context of Schwartz's testimony, GCM has
not accurately interpreted the above exchange. Schwartz's damages model relied on
the percentage of all the IFS stock pledged to secure the debt, as well as all other
stock held by Interamericas and Pimienta. Schwartz performed two damages
calculations for both October 1999 and March 2000--one for the higher percentage
of shares and one for the lower. Schwartz identified a value of IFS's underlying
assets and then multiplied this number by the two percentages of shares.


 Thus, the testimony above--when taken in context of Schwartz's damages model and
the rest of his testimony--clearly refers only to the lower percentage of stock, not to
some estimate of the actual value of the shares.
20. GCM presented evidence that Pimienta would, and, in fact, did, fight to delay or
prevent every action that GCM took to foreclose or collect on its loans.
21. In its second motion for rehearing, GCM asserts that Schwartz did state an opinion
as to the amount that GCM could have recovered. GCM points to the testimony of
Schwartz quoted in footnote 7 supra. However, as discussed above, when asked for
details, Schwartz repeatedly stated that he was not stating an opinion on the value of
the collateral, but only that IFS had some assets available from which GCM could
have recovered had it foreclosed. The other excerpt of Schwartz's testimony cited by
GCM in its second motion for rehearing illustrates this point:

 

 [Attorney]: At the end of the day, your conclusion is as of
October 31, 1999, there was more than enough
money to pay the debt?


 [Schwartz]: Yes.

 

 [Attorney]: So, what you're saying is that if management had
managed to get control of the assets, if GCM had
managed to get control of the assets as of October
31, 1999 and liquidated them, after incurring costs
and things of that nature, there would have been
more than enough there to pay the debt?

 

 [Schwartz]: It appears that would have been the case.


 However, as discussed more fully below, we conclude that the existence of assets that
"appear" to be enough to cover a debt is not sufficient evidence of what, in reasonable
probability, GCM would have recovered in a foreclosure.
22. In its first motion for rehearing, GCM criticizes this Court's reliance on Miller v.
Bank of Commerce, 387 S.W.2d 691 (Tex. Civ. App.--Fort Worth 1965, no writ). 
Specifically, GCM points out that the authorities relied upon by the court in Miller--a
section of Corpus Juris Secundum and Evans v. Burson, 65 Okla. 114 (1917)--both
refer to an unsecured creditor--not a secured creditor like GCM. GCM contends that
a case much more on point is Ross v. W.D. Cleveland & Sons, 133 S.W. 315 (Tex.
Civ. App.--Houston [1st Dist.] 1910, no writ). GCM explains that, in Ross, the
creditors were granted a security interest in collateral to secure a debt, but "refrained
from collecting the debt, based on fraudulent misrepresentations from Defendant,
until the collateral was wasted and the debtor was insolvent."


 First, the court in Miller nowhere expressly states that its holding applies only to
secured creditors. Further, GCM does not contend that the general rules that a
plaintiff is required to produce some evidence from which the jury could reasonably
determine its loss and that speculative damages are not recoverable do not apply in
this case.


 In Ross, the court affirmed a jury verdict for the plaintiff, who was a secured creditor
of the debtor. Ross, 133 S.W. at 317. The defendant, who was also a secured creditor
of the debtor, had the collateral in his possession. Id. The defendant "negligently
failed to exercise ordinary care to preserve, utilize, and appropriate the proceeds" of
the collateral. Id. The plaintiffs sued the defendant, not for misrepresentations about
the collateral, but for the negligent wasting of the collateral. Id. Here, the allegations
against Grant and Deloitte are based on misrepresentations--not on their having
negligently wasted the collateral. Thus, Ross is distinguishable.
23. In its second motion for rehearing, GCM also contends that this holding sets a
"dangerous precedent" because this Court is holding that "any damages that may arise
out of future foreclosure are too speculative to allow recovery." We disagree. As
discussed in the body of this opinion, we are holding that the evidence in this case is
not sufficient to survive a no-evidence review. 
24. GCM did not raise this case before the trial court or in its original brief to this Court.
25. Because of the erroneous advice the "plaintiff was damaged for the following reasons:


 (1) If the purchasers had cured the default, plaintiff would not now be liable for the
delinquent taxes, penalties and redemption fees.


 (2) If plaintiff had foreclosed and entered a full credit bid, he would now have the
property or its equivalent value in money, and would not now be liable for tax
penalties and redemption fees.


 (3) If another bidder had obtained the property, plaintiff would have recovered
foreclosure costs and would not now be liable for the delinquent taxes, penalties and
redemption fees."


 Brown v. Critchfield, 161 Cal. Rptr. 342, 351 (Cal. Ct. App. 1980). 
26. In its motions for rehearing, GCM also contends that Deloitte's other, unchallenged
grounds for summary judgment were all derivative of and dependent upon Deloitte's
contention that the Commercial Loan Agreement was not a security. This is not the
case. For example, Deloitte's supplemental motion for summary judgment included
as grounds that, even if the Commercial Loan agreement was a security, the evidence
established that Deloitte did not aid or abet a violation of the Texas Securities Act or,
alternatively, that there was no evidence that Deloitte aided or abetted a violation of
the Act.
27. In its second issue, GCM challenges the trial court's directed verdict on the lack of
proof of damages due to undisputed evidence that GCM transferred the debt to Blitz
and that Blitz fully satisfied the debt with a promissory note to GCM for the entire
amount of the debt owed by IFS to GCM. We do not reach this alternative argument
that there is no proof of damages due to the full satisfaction of the IFS debt by the
promissory note given to GCM by Blitz. To the extent that Deloitte and Grant
contend that GCM lacks standing due to the promissory note from Blitz, we reject that
challenge because the pleadings by GCM alleged that the erroneous information
provided by Grant and Deloitte caused GCM to restructure the debt rather than to
foreclose on the notes and that, had it foreclosed, it would have recovered something
more than a worthless promissory note. See Tex. Ass'n of Bus. v. Tex. Air Control
Bd., 852 S.W.2d 440, 446 (Tex. 1993) (holding that pleadings, viewed in favor of
plaintiff, must allege facts that affirmatively demonstrate court's jurisdiction to hear
case); Cedar Crest Funeral Home, Inc. v. Lashley, 889 S.W.2d 325, 330 (Tex.
App.--Dallas 1993, no writ) (holding that pleadings that alleged injury from wrongful
conduct showed plaintiffs had standing).
28. In its first issue, GCM challenges the directed verdict in favor of Grant and Deloitte
by asserting that it produced more than a scintilla of evidence that it was unnecessary
to produce the other members of the advisory committee to establish that they would
have voted to foreclose because Jorge Hollander and Malu McKee, through Gamma
Capital Services, had the power to foreclose on IFS. In its fourth and fifth issues,
which concern Grant only, GCM contends that it introduced more than a scintilla of
evidence of Grant's fraud or negligence in failing to timely notify GCM of the 1999
change to the 1998 audit and that it could have foreclosed under other sections of the
agreement, even if GCM had waived the "book value ratio." GCM's remaining
issues, numbered six through 10, concern Deloitte only. GCM contends that it
produced some evidence that Deloitte's business valuations were inaccurate and that
Deloitte committed fraud and conspired to commit fraud with IFS. GCM also asserts
that it did not impermissibly fracture its causes of action against Deloitte, that its
claims against Deloitte are not barred by the statute of limitations, and that the
evidence supports punitive damages. 
29. In its two cross-points, Grant challenges the trial court's denial of a directed verdict
on its negligent misrepresentation claim on the grounds that (1) a negligent
misrepresentation claim requires that the representation be made to a known party for
a known purpose and that GCM did not rely on Grant's audits for a known purpose,
and (2) there was no duty to disclose information under the facts of this case.